UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

UNITED STATES OF AMERICA,
                           Plaintiff,

v.

FRANKLIN GREGG,
                           Defendant.

Action No. 3:11−CR−52

MEMORANDUM OPINION

This matter comes before the Court on Gregg's Motion to Suppress. Gregg challenges the legality of encounters he had with police prior to, leading up to, and after his arrest. The Court grants the Motion in part and denies it in part.

I. Facts

    A. *Execution of the August 31, 2010, Search Warrant*

Detective Janet Mills of the Richmond Police Department swore out a warrant in the City of Richmond on August 31, 2010 ("August 31 warrant"). The warrant ordered a search of "[t]he entire residence and curtilage" of 208 B Dove Street, along with the seizure of "[a]ny and all instrumentalities related to the crime of possession with the intent to distribute crack cocaine" found in the unit. (Search Warrant, Gov't Resp. Ex. 1, Docket No. 17.) The warrant affidavit describes the objects of the proposed search as "[t]he entire residence of 208 Dove Street, Apartment B, located in the City of Richmond, Virginia, north of the James River, *and all persons therein*." (Affidavit for Search Warrant, Gov't Resp. Ex. 1 (emphasis added).) The warrant did

not authorize the search of "all persons therein."

Mills and other agents executed the warrant on September 2, 2010. When officers arrived at the apartment, Mills positioned herself at the back door. Officers knocked and announced their presences at the front door. Gregg exited the back door slowly. Mills, who had known Gregg for three years, ordered Gregg to the ground and searched his person. The search turned up $45 and a plastic bag containing nine knotted plastic bag corners filled with cocaine. Gregg was arrested and released on bail pending a January 11, 2011, court date.

B. *November 2010 and January 2011 Controlled Purchases*

On November 23, 2010, and January 5, 2011, Gregg participated in controlled buys with a confidential police source. On both occasions, Mills outfitted the confidential source with audio and video surveillance equipment and gave him cash for the purchase. The source entered a Barton Avenue apartment and purchased cocaine from Gregg. Both times, the source returned and gave officers the cocaine he received.

C. *January 2011 Traffic Stop and Arrest*

On January 7, 2011, a reliable, cooperating informant telephoned Mills with information about Gregg. The informant had previously provided officers with valuable information about ongoing criminal activity. The informant told Mills he had recently spoken with Gregg. Gregg told the informant that he was carrying a gun because his uncle had recently been shot. Mills knew that a man had been shot on Barton Avenue the previous day, though she did not know if the man was, in fact, Gregg's uncle. Based on the controlled buys, Mills knew Gregg distributed narcotics from the Barton Avenue apartment. Other confidential informants had previously told her that Gregg carried a firearm. Mills also knew Gregg was a potential suspect in a shooting

2

death that occurred on September 18, 2010.

Based on this information, Mills, ATF Special Agent Anthony Spotswood, and Officer Brandon Black conducted surveillance on Gregg's home on January 7. The officers saw Gregg walk out his front door to the sidewalk, reach his right hand inside the zipper of his pants, move his hand around inside of his pants, and then zip up his zipper. Gregg's right arm remained stiff as he continued to walk, as if he was steadying a gun hidden in his waistband. Mills suspected Gregg possessed narcotics in the crotch of his pants and possibly a firearm in his waistband.

The agents continued to observe Mills as he walked down Meadowbridge Road and entered a convenience store. Gregg soon left the store and entered the rear passenger door of a gold Buick occupied by two other males. The vehicle began driving and, at the intersection of Woodrow Avenue and East Norwood Avenue, rolled through a stop sign on a right turn. The agents stopped the car at the intersection of East Norwood and Lamb Avenues.

Spotswood approached the driver's side of the car and Mills approached the passenger's side. Officer Black followed. Mills asked the occupants to roll down their darkly-tinted windows. Mills saw Gregg sitting in the back seat. His breathing appeared labored, his lips turned pale, his voice was shaky, and he avoided eye contact with Mills. The agents ordered the driver and passenger from the vehicle, frisked them, and found no weapons or contraband. One of the agents then asked Gregg to exit the vehicle. After Gregg complied, he told the officers he would not consent to a search of his person. He turned the right side of his body away from the officers. Officer Black asked Gregg if he had a gun on his person. Gregg appealed to Mills, imploring, "Janet, don't do this to me. I have court on Monday." Officer Black again asked Gregg if he had a gun on his person. This time Gregg signaled that he concealed a gun underneath

3

his clothes on the right side of his body. The officers searched Gregg, located the gun, and arrested him.

The officers took Gregg to the headquarters of the Richmond Police Department. Black and Detective Jason Norton took Gregg to the restroom, out of public view, to conduct a full search. In the bathroom, Gregg removed one piece of clothing at a time and handed the clothing articles to Norton for inspection. Gregg handed Norton his underwear and inside Norton found a plastic bag containing 21 individual plastic bag corners filled with cocaine.

II. September 2 Search

Gregg argues Mills's search of his person during the raid on 208 B Dove Avenue exceeded the scope of the August 31 warrant. The parties agree that the warrant omitted language permitting officers to search persons inside the apartment. They disagree on the effect of this omission. The Court agrees with Gregg's contention that the warrant did not authorize Mills to search Gregg's person.

A warrant must "particularly describe[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. This "particularity requirement" prevents general searches and "assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search." *United States v. Chadwick*, 433 U.S. 1, 9 (1977) (citation omitted); *United States v. Williams*, 592 F.3d 511, 519 (4th Cir. 2010). The warrant itself, rather than any supporting documents alone, must satisfy the particularity requirement. *Owens ex. rel. Owens v. Lott*, 372 F.3d 267, 274 (4th Cir. 2004). A warrant satisfies the particularity requirement when it "identifies the items to be seized by their

4

relation to designated crimes" and "the description of the items leaves nothing to the discretion of the officer executing the warrant." *Williams*, 592 F.3d at 519. If the warrant does not identify the person to be searched or seized on its face, a cross-reference to a separate document identifying the person satisfies the particularity requirement. *United States v. Hurwitz*, 459 F.3d 463, 471 (4th Cir. 2006). In this circuit, the cross-reference may expressly incorporate the document into the warrant, or the document may be attached to the warrant. *Id.*

Here, the face of the warrant lacked any reference, direct or indirect, to the persons inside the Dove Avenue home. Therefore, *Groh v. Ramirez*, 540 U.S. 551 (2004), controls this case. There, an ATF agent submitted a warrant application and affidavit listing several weapons he believed were on the respondent's ranch. *Id.* at 554. The magistrate signed an accompanying warrant, but the warrant omitted the list of the firearms and failed to incorporate the application or affidavit by reference. *Id.* Agents undertook a search of the respondent's ranch and turned up nothing. *Id.* at 555. The agents left a copy of the warrant with the respondent's wife, but they did not leave a copy of the application, which had been sealed. *Id.*

The Supreme Court concluded the warrant was "plainly invalid." *Id.* at 557. The Court rejected the argument that the warrant's deficiency was cured by the fact that the warrant application listed the firearms to be seized. *Id.* The search warrant "serves a high function," the Court explained, "and that high function is not necessarily vindicated when some other document, somewhere, says something about the objects of the search[.]" *Id.* (citing *McDonald v. United States*, 335 U.S. 451, 455 (1948)). The Court refused to describe the deficiency as a "mere technical mistake or typographical error"; rather, the warrant failed to "describe the items to be seized *at all*." *Id.* at 558 (emphasis in original). Since the warrant did not describe the firearms

5

to be seized, or incorporate a list of the firearms by reference, the Court lacked "written assurance that the Magistrate actually found probable cause to search for, and to seize, every item mentioned in the affidavit." *Id.* at 560. The Court also reasoned that, because of the omission, the warrant could not vindicate the interest of "assur[ing] the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search." *Id.* at 561 (quoting *Chadwick*, 433 U.S. at 9). The omission made the warrant "so obviously deficient" that the Court considered the ensuing search "warrantless." *Id.* at 558.

On the basis of *Groh*, the Court concludes the August 31 warrant did not provide Mills a basis for searching Gregg's person. In order for the warrant to permit Mills to search Gregg, she needed "written assurance that the Magistrate actually found probable cause" to search Gregg. *Id.* at 560. The warrant provided no such assurance. The warrant contained neither language empowering Mills to search Gregg nor any reference to another document demonstrating the magistrate's belief that there was probable cause to search Gregg. On its face, then, the warrant and the supporting affidavit are in conflict, because it appears the magistrate rejected the language in the affidavit permitting officers to search persons inside the home. Without a reference to that language, the warrant lacked any indication that the magistrate found probable cause to search any persons inside the home.

The government offers three arguments in its attempt to demonstrate that the August 31 warrant fulfilled the particularity requirement. First, the United States contends that the omission of any reference to persons inside the Dove Avenue property was a "mere technical mistake or typographical error" that did not detract from Mills's authority to search persons inside the home. *Groh*, 540 U.S. at 558. The Court disagrees. The warrant did not merely misspell a name or

6

incorrectly identify a particular cross-reference. It omitted a whole category of "persons or things to be seized." U.S. Const. amend. IV. The face of the warrant does not contain any indication that Mills had the power to search any person inside the home. Nor did it cross-reference or attach to the warrant an affidavit giving her that power. No one reading the warrant alone could find evidence Mills had the authority to search an individual inside the home.

Second, the government argues its decision to provide Gregg a copy of the affidavit in preparation for his motion cured any deficiency in the warrant. The Court rejects this argument. Some courts have concluded that disclosure of a supporting affidavit helps cure a warrant's ambiguity, but those cases do not lend insight to the facts of this case. *See United States v. Wuagneux*, 683 F.2d 1343, 1350 (11th Cir. 1982); *Rickert v. Sweeney*, 813 F.2d 907, 908 (8th Cir. 1987). In those cases, supporting affidavits helped cure ambiguous phrases on the faces of several warrants. There is no such phrase at issue here. Mills was not empowered to search persons inside the home subject to an ambiguous description of the search objects. The warrant lacked any reference at all to the persons inside the Dove Avenue home. That the defendant had the affidavit in his possession while preparing his motion to suppress did not make it any more likely that the warrant, or any document cross-referenced in it, demonstrated that the magistrate found probable cause to search anyone inside the home.

Finally, the government argues that the good faith exception to the warrant requirement recognized in *United States v. Leon*, 468 U.S. 897 (1984), legitimized Mills's search. The Court disagrees. To begin with, these facts do not trigger the *Leon* rule. In *Leon*, the warrant-issuing magistrate decided that an officer's affidavit supported a finding of probable cause for a search, but the reviewing district court disagreed. 468 U.S. at 902-03. The Supreme Court held that the

7

search was valid where officers executed the warrant on the good faith belief that the affidavit demonstrated probable cause. *Id.* at 922. Here, Gregg has not argued that the warrant-issuing magistrate was incorrect in concluding probable cause existed to search persons inside the Dove Avenue home. Instead he contends that the warrant's failure to specify the persons inside the home as legitimate search objects, or to refer to a document stating the same, meant that the magistrate never made an authoritative judgment that probable cause existed to search persons in the home. The Court agrees. A warrant-issuing magistrate's finding of probable cause is a prerequisite for application of *Leon*'s good faith exception to the warrant requirement. Here the warrant gives no indication that the magistrate made such a finding.

Furthermore, to the extent *Leon* sheds light on these facts, it expressly weakens the government's argument. Among the circumstances under which the Supreme Court noted that the good faith exception would not apply is when a warrant is "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Id.* at 924. *See United States v. Hyppolite*, 65 F.3d 1151, 1156 (4th Cir. 1995). That language describes the situation leading up to the execution of the August 31 warrant. As the Court has explained, the warrant omitted any reference to persons inside the home, making it unreasonable for an officer to conclude from the warrant that there was probable cause to search anyone inside.

III. January 7 Traffic Stop

Gregg next challenges his stop and arrest on January 7. Police may stop a vehicle when the driver has violated a traffic law. *Whren v. United States*, 517 U.S. 806 (1996); *United States*

*v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993). Such a stop constitutes a seizure of the driver and of all the vehicle's passengers. *Brendlin v. California*, 551 U.S. 249, 257 (2007). An officer making a traffic stop may order the vehicle's occupants out of the car for the duration of the stop. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1997); *Maryland v. Wilson*, 519 U.S. 408, 415 (1997). *See United States v. Rumley*, 588 F.3d 202, 206 (4th Cir. 2009). An officer may ask an occupant questions about matters unrelated to the justification for the traffic stop without exceeding the scope of the seizure. *Muehler v. Mena*, 544 U.S. 93, 100-01 (2005). If his questions extend the duration of the stop, however, the officer exceeds the scope of the original seizure, and he must have reasonable suspicion that the occupant is armed or guilty of a crime to do so. *Id. See United States v. Branch*, 537 F.3d 328, 337 (4th Cir. 2008).

Once an officer orders a passenger out of a vehicle subject to a stop, the officer may perform a *Terry* frisk if he has reasonable suspicion that the passenger is armed and dangerous. *Arizona v. Johnson*, 555 U.S. 323, 129 S.Ct. 781, 787 (2009). Reasonable suspicion requires that the intrusion be based on "specific and articulable facts . . . taken together with rational inferences from those facts," suggesting criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). Reasonable suspicion cannot result only from an "inchoate and unparticularized suspicion or 'hunch'" of criminal activity. *Id.* at 27. Reasonable suspicion is a less demanding standard than probable cause; the quantum of proof necessary to demonstrate it is considerably less than a preponderance of the evidence. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *Branch*, 537 F.3d at 336. Whether reasonable suspicion exists depends upon the totality of the circumstances at the time of the stop, considered objectively. *United States v. Arvizu*, 534 U.S. 266 (2002); *Branch*,

9

537 F.3d at 337. A court must take a "commonsense and contextual approach" to determining whether a *Terry* stop was legal. *Id.* at 336.

Gregg argues the agents lacked reasonable suspicion to order him out of the car and ask him questions during the January 7 traffic stop, but he is incorrect. The Court notes that the officers saw Gregg exit the front door of his home, reach his right hand inside the zipper of his pants, move his hand around inside of his pants, and then zip up his zipper. At the same time, Gregg's right arm remained stiff, as if he was using it to steady a gun. During the traffic stop, Gregg's right arm remained stiff and he turned the right side of his body away from the agents. The Court credits Mills's judgment that these actions were indicative of involvement in criminal activity. *See Branch*, 537 F.3d at 336. Also during the stop, Gregg's breathing was labored, his lips turned pale, and he avoided eye contact with Mills. This "[n]ervous, evasive behavior is a pertinent factor" in the Court's conclusion that reasonable suspicion existed to question Gregg. *Wardlow*, 528 U.S. at 124. On their own, those acts might have supplied reasonable suspicion to detain Gregg.

The Court need not decide whether they did, though, because the officers had another basis for developing reasonable suspicion that Gregg was armed and involved in criminal activity. A reliable informant notified Mills that Gregg was carrying a gun on the day of the traffic stop. Information a confidential informant provides can contribute to reasonable suspicion of criminal activity. *See Alabama v. White*, 496 U.S. 325, 329 (1990); *United States v. Perkins*, 363 F.3d 317 (4th Cir. 2004). Factors relevant to assessing whether a tip is reliable include the informant's reliability, veracity, and basis of knowledge. *Illinois v. Gates*, 462 U.S. 213, 230 (1983); *United States v. Walker*, 319 Fed. App'x 307, 310 (4th Cir. 2009). A tip is likely to have sufficient

indicia of reliability if it comes from a known informant "whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated." *Florida v. J.L.*, 529 U.S. 266, 270 (2000).

The informant in this case disclosed his or her identity to Mills, providing accountability and risking liability for a false report. Mills knew the informant previously gave the police detailed and accurate information about ongoing criminal activity. Furthermore, the information the informant provided—that a man Gregg claimed was his uncle had recently been shot and that Gregg carried a weapon—proved accurate. Finally, the informant had a reliable basis of knowledge regarding Gregg's activity, having spoken with Gregg on the telephone. During the conversation, Gregg told the informant that his uncle had been shot and Gregg was carrying a gun. Given the informant's tip and Gregg's behavior before and during the traffic stop, the officers had ample justification for detaining Gregg for a longer period than was required by the stop.

IV.  January 7 Strip Search

The "means and procedures" officers undertake to perform bodily intrusions, such as a body cavity search, must comport with Fourth Amendments standards of reasonableness. *Bell v. Wolfish*, 441 U.S. 520, 560 (1979); *Schmerber v. California*, 384 U.S. 757, 769 (1966). In deciding whether a body cavity search is reasonable, the Supreme Court directs courts to balance the need for the search against the invasion of personal rights the search entails. *Bell*, 441 U.S. at 559. To this end, a court must consider (1) the scope of the intrusion, (2) the manner in which it is conducted, (3) the justification for initiating it, and (4) the place in which it is conducted. *Id.* at 558-59. The Fourth Circuit has explained that the fourth *Bell* factor is "especially relevant" in

11

determining the reasonableness of a strip search. *Polk v. Montgomery Cty.*, 782 F.2d 1196, 1201 (4th Cir. 1986).

Here the officers' search was reasonable. The officers were entitled to conduct the search in order to preserve evidence for trial. The search extended to Gregg's clothing and skin surface; officers did not visually or manually inspect his body cavities. Additionally, officers asked Gregg to remove each article of his clothing and hand each to Detective Norton, which Gregg did. There is no evidence that the officers forcibly removed Gregg's clothing or manipulated his body parts. Crucially, the officers conducted the search in the bathroom of the Richmond Police Department headquarters, away from public view, with only Norton and Officer Black present. Given the officers' investigatory need to search Gregg and the measured manner in which they carried it out, the officers' search of Gregg's person did not violate his Fourth Amendment rights.

V. Conclusion

For the reasons stated above, the Court grants Gregg's Motion in part and denies it in part.

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

An appropriate Order will issue.

> _____/s/_____
> James R. Spencer
> Chief United States District Judge

ENTERED this \_\_\_15th\_\_\_\_\_ day of June 2011